**In the Matter of an Arbitration Between KARAHA BODAS COMPANY, L.L.C., Petitioner,**

v.

**PERUSAHAAN PERTAMBANGAN MINYAK DAN GAS BUMI NEGARA ("Pertamina"), Respondent.**

No. M–18–302 (TPG).

United States District Court, S.D. New York.

Jan. 29, 2004.

James E. Berger, Esq. & Christopher F. Dugan, Esq., Paul Hastings, Janofsky & Walker LLP, Washington, DC, for Karaha Bodas.

Carolyn B. Lamm, Esq. & Frank Pano-poulos, Esq. White & Case LLP, Washington, DC, for Ministry of Finance of the Republic of Indonesia.

Matthew D. Slater, Esq., Justin S. Anand, Esq. & Jonathan Blackman, Esq., Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Pertamina.

## OPINION

GRIESA, District Judge.

On February 14, 2003 petitioner Karaha Bodas Company L.L.C. ("KBC") filed a motion seeking an order (1) directing Bank of America to transfer to KBC approximately $266 million, which was being held in certain accounts pursuant to a restraining notice; and (2) directing Bank of America to transfer to KBC certain additional funds on a monthly basis. Respondent Pertamina opposes the motion. The Ministry of Finance of the Republic of Indonesia ("the Republic") has been permitted to participate in this proceeding as a "Non–Party with Interest." The Republic also opposes the motion.

Almost simultaneously with the above motion, Pertamina filed a motion to stay execution, contending that the court should hold the proceedings brought by KBC in abeyance pending the outcome of the underlying litigation then pending in the Fifth Circuit and the outcome of a certiorari petition to the Supreme Court from a Second Circuit decision dealing with the funds held at Bank of America.[1]

On April 28, 2003 the Republic filed a motion seeking the release of approximately $262 million from Bank of America accounts, claiming that those funds belonged to the Republic of Indonesia and could no longer be restrained.

At a hearing held on May 23, 2003 the court decided certain issues raised by KBC's February motion and the Republic's April motion, but left certain issues for further consideration. No funds were actually turned over or released.

On June 27, 2003 KBC filed a new motion, which in effect replaced KBC's February 2003 motion. The new motion re-

---

1. Certiorari has since been denied.

fined the issues dealing with KBC's rights in funds held by Bank of America and funds passing through Bank of America, and requested an order requiring Bank of America to turn funds over to KBC.

### Facts

KBC is a corporation located in the Cayman Islands with its center of operations in the United States. Pertamina is an Indonesian state-owned oil and gas company. KBC and Pertamina entered into contracts in 1994 for a joint venture involving the development of facilities in the Karaha area of West Java. In 1997 the projects were suspended as a result of Indonesian government decrees. This termination of operations led KBC to seek arbitration in Switzerland for breach of contract by Pertamina.

On December 18, 2000 the arbitral panel made an award of $261.1 million to KBC against Pertamina. On December 4, 2001 the award was confirmed by the U.S. District Court for the Southern District of Texas, and judgment was entered in that court for $261.1 million. Pertamina has appealed that judgment to the Fifth Circuit, and that appeal is still pending. Pertamina declined to file a supersedeas bond under Fed.R.Civ.P. 62(d), and therefore there is no stay of execution.

Wholly apart from the contracts with KBC, Pertamina's business activities involved the marketing of oil and gas products. It had at times carried this out through joint ventures with private contractors, pursuant to agreements known as Production Sharing Contracts. The sales proceeds of some of these ventures were channeled through trust accounts held in Pertamina's name at Bank of America and the Bank of New York. A total of twenty-four such accounts are at issue in this proceeding.

The court has heard extensive evidence regarding fifteen of these accounts, all at Bank of America, now referred to as the "adjudicated accounts." These bear the names of the joint venture projects in Indonesia.

- Arun III
- Bes MCGC
- Bontang V
- Bontang VI
- Arun II
- Bes AQP
- Bontang II
- BLPG PKG V
- BLPG PKG VII
- BES Korea II
- BES KCO
- Bontang III
- Bontang IV
- East Java
- ONWJ

An additional nine accounts are also the subject of this proceeding. Seven of these are at Bank of America:

- West Natuna
- Corridor
- KMI
- CILACAP
- East Java Thruput Fee
- South Sumatra
- BLRE

Two are at the Bank of New York:

- MUSI II Trust
- EXOR I Trust

The issues dealt with in this opinion relate only to the Bank of America accounts. The Bank of New York accounts will not be referred to hereafter.

As already indicated, the evidence regarding the adjudicated accounts shows that they are trust accounts containing

revenues generated from Production Sharing Contracts. The revenues enter the trust accounts in Pertamina's name. However, pursuant to Pertamina's standing instructions, upon receipt of these revenues, Bank of America, as trustee, makes certain payments. The payments cover operational expenses incurred by the joint venture, as well as expenses incurred by the joint venturer and the share of the profit owed to the joint venturer. What is left over after these payments is a balance to be paid to Pertamina. This balance will be referred to hereafter as "the amount payable to Pertamina." For reasons that will be explained hereafter, there has been extensive litigation in this court regarding how much of the money payable to Pertamina actually belongs to Pertamina, as opposed to the Republic of Indonesia.

On February 22, 2002 the Texas judgment was registered in the Southern District of New York. Restraining notices were issued pursuant to N.Y. C.P.L.R. § 5222, one of which was served on Bank of America. Bank of America complied with the restraining notice by placing in escrow the funds payable to Pertamina from all twenty-two of the trust accounts discussed above that were located at the Bank.

The Republic moved to quash the restraining notices, asserting that it owned all of the restrained funds, that the judgment debtor Pertamina owned none of the funds, and therefore that KBC had no right to restrain any of the funds. KBC opposed the motion, taking the view that Pertamina owned all of the funds in question and that all were subject to restraint. On April 5, 2002 the court issued a bench ruling embodied in an order dated April 24, 2002. The court dealt only with the 15 "adjudicated accounts" and made no decision regarding the others. The court determined that Pertamina had a property

right in the adjudicated accounts "to the extent of its five percent (5%) Retention Fee, which can be executed upon in the manner allowed under New York C.P.L.R. 5222(b)." The court also determined that under Indonesian law the Retention Fee was equal to 5% of Net Operating Income generated from each Production Sharing Contract. The court held that the remaining funds payable to Pertamina were owned by the Republic of Indonesia, and that the accounts could not be executed upon to the extent of the Republic's portion. Enforcement of these provisions of the April 24 order was stayed, however, to allow for review by the Court of Appeals.

All parties sought leave to appeal the court's order. KBC sought reversal of the court's determination that only 5% of Net Operating Income was owned by Pertamina. Pertamina and the Republic appealed, objecting to a ruling that as much as 5% belonged to Pertamina.

On June 7, 2002 the total amount restrained by Bank of America reached $546 million, or approximately twice the amount of the judgment plus interest—*i.e.,* $503 million in the adjudicated accounts and $43 million in the remaining seven accounts. It appears that at that point the Bank stopped restraining additional payments into the adjudicated accounts. According to the record before the court, Bank of America acted on its own. There was no court order and no court determination regarding any issues under C.P.L.R. § 5222(b).

On June 18, 2002 the Court of Appeals granted all motions for leave to appeal, and issued an order modifying the District Court's restraint. The Court of Appeals stated:

> Because Bodas also has a substantial possibility of success on the merits, we conclude that the district court did not abuse its discretion. However, we modi-

fy the stay to apply only to sufficient funds to satisfy the judgment, because no legitimate interests are served by tying up funds beyond what would be necessary to make Bodas whole if it prevails on appeal.

Bank of America then undertook to give effect to the Court of Appeals order. The Bank took the total amount restrained in the adjudicated accounts as of June 7, 2002 ($503,441,910.86) and subtracted the amount of KBC's judgment, plus interest as of June 7 ($276,633,524.59). This left an amount to be disbursed out of the $503 million of $228,808,386.23. Bank of America then deducted from this amount legal fees of $249,817.02 and added interest from June 7 of $260,727.35, giving a net to be released out of the adjudicated accounts on June 19 of $226,819,296.59.

Robert Braun of Bank of America states that no other funds have been restrained in the fifteen adjudicated accounts beyond the $276,663,524.59 (which will be referred to hereafter as $277 million) except to cover the 4% interest accruing on the judgment. At a November 12, 2003 hearing the amount restrained from the adjudicated accounts was estimated by the Republic's lawyers to be approximately $290 million.

The Court of Appeals order of June 18 did not affect the seven other Bank of America accounts. Thus the $43 million remained on hold, and Bank of America resumed withholding amounts coming into these accounts. The total amount withheld reached almost $290 million as of June 2003. At this time Bank of America ceased withholding further amounts from the seven accounts.

On December 10, 2002 the Court of Appeals affirmed the District Court's April 24 order, stating:

The district court correctly adjudicated the relative ownership interests of the Republic of Indonesia and Pertamina. We therefore affirm the district court's order granting KBC's motion to attach the Retention and denying KBC's motion to attach the remainder of the disputed funds. Because this is not an appeal from a final judgment, proceedings in the district court will presumably move on to other matters. We direct the district court, in the course of those proceedings, to continue the stay presently in force or to substitute one similar until such time as the parties' rights to the disputed funds are finally determined.

*Karaha Bodas Co. v. Pertamina,* 313 F.3d 70, 92–93 (2d Cir.2002). Thus the Court of Appeals held that Pertamina had ownership rights only as to the Retention Fee, and that the Republic was the owner of the rest of the funds, although they were nominally payable to Pertamina.

In the various proceedings before this court, it has been necessary to determine what fractional portion of the funds payable to Pertamina comprised the Retention Fee. It should be recalled that it was the funds payable to Pertamina (arrived at after deducting various amounts described earlier in this opinion) which were restrained by Bank of America. The Retention Fee has been spoken of as 5% of Net Operating Income. This is correct. But Net Operating Income is not synonymous with the funds payable to Pertamina. In order to arrive at the latter amount, the sum payable to the joint venturer is deducted from Net Operating Income. The Court of Appeals has set forth a useful illustration of what occurs. In the following quotation "PSC Revenue" actually means Net Operating Income.

For instance, if the PSC Revenue were $100, Pertamina's retention would be $5, or five percent. Under the terms described in Pertamina's annual reports,

though, the PSC Revenue would be divided: $35 would go to the PSC contractor, and $65 would go to Pertamina in New York, then be transferred immediately to the Ministry in Jakarta. Once the $65 reached Jakarta, Pertamina would receive $5. After taxes and dividends, however, Pertamina would only retain $1.

*Id.* at 84 n. 13. The concept embodied in the quoted footnote has been used frequently by the parties and the District Court in proceedings following the Court of Appeals ruling. In the illustration used in the Court of Appeals footnote, when Net Operating Income ($100) is reduced by the $35 payable to the joint venturer, this leaves $65, which is the amount payable to Pertamina. Pertamina's Retention Fee is $5 out of this $65, or 5/65 of the amount payable to Pertamina.[2]

In February and April of 2003, KBC, Pertamina, and the Republic filed three of the motions with which this opinion is concerned, addressing issues related to exactly how much money held by Bank of America was subject to execution by KBC. The court held oral argument on the three motions at a hearing on May 23, 2003.

One of the issues related to the proper method for calculating Net Operating Income, and was resolved in a bench ruling. It had been agreed that Net Operating Income was arrived at after deducting expenses of the joint venture. What was still in dispute was whether expenses of the joint venturer should also be deducted in calculating Net Operating Income. The court ruled that they should.

Also discussed at the May 23 hearing was a broader issue about the extent of KBC's rights. The Republic took the position that no further Retention Fees passing into the adjudicated accounts after June 9, 2002 were subject to restraint and that the total of the Retention Fees restrained was about $20 million. KBC contended that the restraint continued to apply after June 9 and would so continue until the amount of the restrained fees reached the amount of $277 million plus interest.

At the hearing of May 23, 2003 the court deferred decision on this issue, but took the view that, at least prospectively, there should be no doubt that Retention Fees flowing into the adjudicated accounts were subject to restraint up to the entire amount specified by the Court of Appeals as necessary to secure the judgment. This was embodied in an order of May 30, 2003, which provided that "beginning now and from this time forward, the restrained funds [the $277 million plus interest] will be considered security for all Retentions earned by Pertamina in connection with the projects involved in the accounts subject to the stay. The amounts of such Retentions will be subject to findings by the court on presentation of appropriate evidence." The court invited KBC to make a new motion addressing these matters. KBC filed such a motion on June 27, 2003.

The Republic sought to appeal or to obtain a writ of mandamus regarding the May 30, 2003 order. On December 17, 2003 the Court of Appeals dismissed the Republic's appeal for lack of jurisdiction,

---

**2.** In certain recent submissions the parties have alluded to the possibility that a slightly different method of calculation has been used. But these suggestions have not thus far been presented in sufficiently cogent fashion for the court to base any finding on. Consequently for purposes of this opinion, the court will make use of the method of calculation illustrated by the Court of Appeals. In any event, any changes in the *method of calculating* the Retention Fee, while perhaps resulting in adjustments in the figures, will not alter what the court is saying about the Retention Fee *in principle*.

stating that it found "no basis upon which to assert jurisdiction over this appeal because the district court has yet to determine what amount, if any, of the restrained funds is owned by the Republic. As a result, the district court's order has had no legal effect, nor does it determine with finality any aspect of the motions of the parties." The Court of Appeals went on to state:

> The proper course is to permit the district court to receive the additional evidence it has indicated is necessary to make a final determination of the restrained funds owned by Pertamina. We trust that the district court knows, and will be mindful of the fact, that if and when some portion of the restrained funds is determined to be owned by the Ministry, no portion of the Ministry's funds can serve as security to satisfy the debt of Pertamina. Further, we note that nothing in our prior orders in this case prevented the district court from restraining incoming funds that belong to Pertamina, up to the amount of the judgment due to appellee Karaha Bodas Company, LLC ("KBC").

The Court also denied the mandamus petition.

### The Current Issue for Decision

Although this opinion deals with four motions, there is one basic issue which now needs to be decided as a result of all of the motions. This relates to the period of time over which the Retention Fees passing into the adjudicated accounts should be considered to have been captured by the restraining notice served on Bank of America.

The Republic and Pertamina contend that the restraining notice was operative against the adjudicated accounts only until June 7, 2002, when the amount restrained in these accounts and in the other seven accounts at Bank of America reached approximately double the amount of the judgment plus interest, or a total of $546 million—$503 million in the adjudicated accounts and $43 million in the other seven accounts. As already described, the Court of Appeals issued an order on June 18, 2002 requiring that the portion of the $503 million to be restrained should be reduced to the amount of the judgment ($261.1 million). The parties agree that interest should be added. As of June 18 the amount of the judgment plus interest was $277 million and interest has continued to accrue. The Republic and Pertamina now take the position that 5/65 of the $277 million plus interest, or a little over $20 million, is all that is available to KBC out of the adjudicated accounts, to secure its judgment or to be executed upon.

KBC's position is radically different. KBC contends that all Retention Fees coming into the adjudicated accounts from February 22, 2002 (when the restraining notice was served) until the present time have been, and will be, captured by the restraining notice, up to the amount of the $277 million plus interest.

### Discussion

Fed.R.Civ.P. 69(a) provides as follows:

> Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution ... and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought....

New York C.P.L.R. § 5222(b) is one of the New York provisions dealing with supplementary proceedings following a judgment, and provides for restraining notices.

> All property in which the judgment debtor or obligor is known or believed to

have an interest then in and thereafter coming into the possession or custody of such a person [a party served with a restraining notice], including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs.... If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

A further provision allows a court on its own initiative or on the motion of any interested party to make an order conditioning or modifying the use of a procedure for enforcing a judgment. C.P.L.R. § 5240.

Pursuant to § 5222(b), the restraining notice served on Bank of America applied to all funds which Pertamina was "known or believed to have an interest then in or thereafter coming into the possession or custody of" Bank of America. The Bank was required to apply the restraint to such funds until the withheld money "belonging or owed to" Pertamina is "equal to twice the amount due on the judgment." After that "the restraining notice is not effective as to other property or money." C.P.L.R. § 5222(b).

As already described, Bank of America restrained funds beginning February 22, 2002, when the notice was served. It restrained funds payable to Pertamina in the fifteen adjudicated accounts, as well as the seven other accounts mentioned previously. All these restrained funds were deemed to be funds in which Pertamina was "known or believed to have an interest," despite the fact that there was a contest over who actually owned the funds payable to Pertamina. Although Bank of America was not a party to that contest, it promptly learned about it. But Bank of America restrained all the funds in the twenty-two accounts payable to Pertamina. Under § 5222(b), the restraining notice would continue to operate until the "money belonging or owed to" Pertamina was equal to twice the amount due on the judgment.

On April 5, 2002 the District Court held that only the Retention Fee portion of the funds payable to Pertamina actually belonged to Pertamina. This would be 5/65 of those funds. Nevertheless, Bank of America continued restraining the funds after the April 5 decision.

Bank of America ceased restraining further funds as of June 7, 2002 when the amount withheld from all twenty-two accounts reached $546 million. This cessation occurred despite the fact that twice the amount of the "money belonging or owed to" Pertamina was only a fraction of the $546 million, according to the District Court ruling. Under this ruling, Pertamina was entitled to 5/65 of the $503 million in the adjudicated accounts or $39 million. There had been no determination as to the ownership of the $43 million in the other seven accounts. Thus, as of June 7, 2002, taking into account the District Court ruling, out of the $503 million restrained in

the adjudicated accounts only $39 million was "money belonging or owed to" Pertamina. If this $39 million is added to the entire $43 million in the other seven accounts, the total of $82 million was far less than twice the amount due on the judgment. Thus there was, and is, no basis for any theory that the restraining notice ceased to operate against Bank of America on June 7, 2002.

Shortly thereafter the Court of Appeals issued its order of June 18, 2002, allowing appeals from the District Court's order of April 24, 2002. At the same time, the Court of Appeals directed that the amount of the restrained funds from the adjudicated accounts be reduced. The statement of the Court, already quoted, bears repetition.

> Because Bodas also has a substantial possibility of success on the merits, we conclude that the district court did not abuse its discretion. However, we modify the stay to apply only to sufficient funds to satisfy the judgment, because no legitimate interests are served by tying up funds beyond what would be necessary to make Bodas whole if it prevails on appeal.

Although the Court of Appeals did not expressly refer to a state statute, its modification of the restraint was consistent with C.P.L.R. § 5240.

The Court did not deal with the issue of Retention Fees, nor did it voice any opinion as to how § 5222(b) would be applied to Retention Fees. It surely did not sanction any idea that KBC's rights under § 5222(b) were cut off in such a way that the amount of KBC's security was a mere $20 million. Any such assumption would have been wholly contrary to the structure which the Court of Appeals was setting up. The Court simply stated that an *amount of*

*money* sufficient to satisfy the judgment was all that should be withheld, and that there was no need to set aside twice that amount. But whether it was Retention Fees which made up that amount, and if so, over what period of time those Retention Fees accrued—these were questions which the Court of Appeals did not touch.

Based on their present accountings, Pertamina and the Republic have reported to the court that during the period from February 22 through December 31, 2002 a total of $178,161,403 in Retention Fees passed into the adjudicated accounts at Bank of America.[3] Since about $39 million in Retention Fees had gone into those accounts as of June 7, 2002, it appears that there was another $139 million by the end of the year.

What occurred in 2003 has unfortunately not been resolved. At a hearing of August 27, 2003, the attorney for Pertamina estimated that the Retention Fees relating to the adjudicated accounts were running about $10 million per month. An indication of a somewhat different amount appears from the fact that about $1.9 billion in funds payable to Pertamina passed into the adjudicated accounts in 2003, and using the 5/65 fraction would yield Retention Fees of about $146 million for 2003. However, Pertamina and the Republic have now come up with various arguments which would whittle down the 2003 figure to much lower amounts or possibly zero, depending on how their various contentions play out. Since the purpose of this opinion is largely to resolve an issue in principle, the details of the contentions of Pertamina and the Republic regarding 2003, and the counter-contentions of KBC, will not be set forth or resolved here.

---

**3.** Prior to the hearing of January 27, 2004 there was some dispute about the correctness of the $178,161,403. But at the hearing all parties agreed to this figure.

Regarding the seven other accounts, as of November 2003 the amount restrained in these accounts was $289 million. There has not been any adjudication regarding what portion of the $289 million belongs to Pertamina. But it cannot be assumed that it is all of the $289 million, and if it were to turn out that Pertamina's share was 5/65, then the amount owned by Pertamina and subject to execution would be about $22 million.

It is now necessary to decide how C.P.L.R. § 5222(b) operated after June 7 and June 18 on the adjudicated accounts.

Pertamina and the Republic contend that the operation of the restraining notice ceased when the amount withheld in the adjudicated accounts, and the seven other accounts, reached $546 million on June 9, 2002—*i.e.*, twice the amount of the judgment plus interest. But Pertamina and the Republic are involved in a contradiction. For the purpose of stopping the operation of the restraint they argue that the amount subject to § 5222(b) reached double the amount of the judgment on June 7. But for the purpose of limiting the amount which actually secures KBC's judgment, Pertamina and the Republic argue that this is only a small fraction of the amount restrained—actually only 5/65 of the $277 million plus interest limit imposed pursuant to the Court of Appeals order of June 18, 2002, this fraction being as of that time, a little over $20 million.

This is not the proper application of the law. In setting forth what *is* proper, it is appropriate to accept one prong of the argument of Pertamina and the Republic. It is now established as to the adjudicated accounts that the only part of the funds payable to Pertamina which actually *belonged* to Pertamina, were the Retention Fees. So, according to Pertamina and the Republic's own argument, with which the court agrees, this should be the basis for deciding how § 5222(b) applied. What was formerly uncertain about property rights is now settled.

The court has stated earlier that there was no basis for any idea that the restraining notice ceased to operate against Bank of America on June 7, 2002 when the total funds withheld in all the accounts reached $546 million ($503 million in the adjudicated accounts and $43 million in the other seven accounts). The reason is that as of this time the District Court had ruled that only the Retention Fee portion actually belonged to Pertamina and was subject to execution, and this was only a fraction of the $546 million. Obviously, there was still doubt about the ownership of the funds because the District Court ruling was subject to appeal, but there is no justification for any categorical position that KBC's rights of restraint against the adjudicated accounts ceased as of June 7, 2002. And we now know that the Court of Appeals affirmed the District Court.

As a matter of law under § 5222(b), the restraining notice would continue to operate after June 7, 2002 until the withheld "money belonging or owed to" Pertamina was equal to twice the amount of the judgment. The Court of Appeals order of June 18, 2002 did not halt the operation of § 5222(b). All that Court did was to modify the *limit*, so that, instead of a limit of twice the amount of the judgment, there was a ceiling of the amount of the judgment.

After June 18, funds payable to Pertamina were continuing to flow into the adjudicated accounts. A portion of these funds (the Retention Fees equal to 5/65 of those funds) *belonged* to Pertamina. Pursuant to § 5222(b), with the modification of the Court of Appeals, the *restraint* continued to apply to the Retention Fees coming into the adjudicated accounts and would continue to apply until the total of the Retention

Fees reached the amount of the judgment plus interest. As of November 2003 this was about $290 million. Thus the restraint applied to the entire $178,161,403 in Retention Fees entering the adjudicated accounts from February 22 to the end of 2002 and also the Retention Fees earned thereafter up to an additional amount of at least $110 million.

As Retention Fees continued to flow into the adjudicated accounts after June 18, 2002, Bank of America was not required literally to put a freeze on these post-June 18 Retention Fees. The $277 million (or the $290 million) was many times larger than the amount of Retention Fees that had passed into the adjudicated accounts. As time moved on from June 18, and additional Retention Fees continued to flow into the accounts, the restraint applied to those fees, as already described, up to the amount of the limit established by the Court of Appeals. But the amount of money withheld pursuant to the Court of Appeals's order continued to be much larger than the Retention Fees subject to restraint. For instance, as of the end of 2002 the amount withheld was a little over $280 million, whereas the total Retention Fees subject to the restraint was $178 million. Thus, Bank of America did not need to, and indeed could not, literally put a hold on these Fees.

Thus we have a situation, perhaps unique, where Retention Fees were subject to restraint as they passed into the adjudicated accounts, but where Bank of America could not literally freeze the additional Fees because there was already a sum of money withheld which was far in excess of the Retention Fees as they were coming into Bank of America.

It is necessary at this point to examine the nature of the funds dealt with by the June 18, 2002 Court of Appeals order. Pertamina and the Republic in effect argue that such funds constituted a kind of *res*, owned partly by Pertamina (and thus subject to execution by KBC) and partly by the Republic, which *res* amounted to $277 million as of June 18, 2002. According to Pertamina and the Republic, when it was later held by the Court of Appeals that Pertamina owned only the Retention Fee portion and the Republic owned the rest, this established what KBC had a right to execute on, and that was limited to $21 million out of the $277 million *res*. Pertamina and the Republic contend that the Republic had a right to take the other $256 million. If distribution was held up by litigation, interest might accrue, but this would simply be an amount of additional money to be shared out of such *res*.

It will be recalled that Pertamina and the Republic take the view that the restraining notice against the adjudicated accounts ceased to operate on June 7, 2002, when the amount restrained in the accounts and the other seven accounts reached twice the amount of the judgment. It follows, in their view, that the restraining notice did not have any further operation after the June 18, 2002 Court of Appeals order. Thus, according to the contention of Pertamina and the Republic, after the division of the *res* of $277 million plus interest, there is nothing further available to KBC to secure its judgment beyond the $21 million portion of the $277 million plus a small amount of interest.

These positions of Pertamina and the Republic are not supported by either the facts or the law. No court has held that KBC's rights are limited to a $21 million share of the $277 million on the basis that the $277 million was a *res* belonging to two property owners or on any other basis. As to the June 18, 2002 ruling, all that the Court of Appeals did was to fix a limit on the *amount* of money which Bank of America could withhold. The Court did

not decide anything about who would or would not have property rights or security rights in that amount of withheld money. The issue of property rights was to be determined on the appeal. The Court said that the stay should "apply only to sufficient funds to satisfy the judgment." The *amount of money* should be sufficient to satisfy the judgment but no more.

The December 2002 decision of the Court of Appeals phrased the question on appeal as follows:

> The question on appeal concerns the ownership of the funds in the Bank of America trust accounts....

*Karaha Bodas v. Pertamina*, 313 F.3d 70, 75 (2d Cir.2002). In affirming the District Court ruling that Pertamina owned only the Retention Fee portion of these accounts, the Court of Appeals was dealing with the "trust accounts," not with a specified fund or *res* of $277 million or thereabouts. This is made clear in numerous parts of the opinion. *See, e.g., id.* at 78, 79, 83, 93. The Court, referring to its June 18, 2002 order, stated:

> Finally, we modified the stay to apply only to those funds that would be necessary and sufficient to satisfy a judgment.

*Id.* at 84. Thus the Court of Appeals did not indicate in any way that KBC's rights were limited to some fraction of a $277 million *res*.

After losing its argument that KBC was entitled to execute on *all* the funds nominally payable to Pertamina, KBC, in its February 2003 motion, raised as one of the issues the duration of the restraint, which is the subject of the present opinion. As described earlier, at a hearing on May 23, 2003 and in an order of May 30, the District Court, while not finally deciding the question, issued a direction having *prospective* effect, that "beginning now and from this time forward, the restrained funds [the $277 million plus interest] will

be considered security for all Retentions earned by Pertamina in connection with the projects involved in the accounts subject to the stay."

This was flatly contrary to the idea that KBC's rights were limited to certain property rights in a $277 million *res*.

While the Court of Appeals in December 2003 refused to take jurisdiction of an appeal and denied mandamus—all without an extensive opinion—it made a significant pronouncement, which was clearly consistent with the approach of the District Court in its May ruling. The Court stated:

> Further, we note that nothing in our prior orders in this case prevented the district court from restraining incoming funds that belong to Pertamina, up to the amount of the judgment due to appellee Karaha Bodas Company, LLC ("KBC").

Thus there are the most solid grounds for concluding that KBC's restraining notice is not limited in its application to a portion of a finite *res*, consisting of the $277 million plus interest. The $277 million is an amount of money held by Bank of America. It was a portion of the $503 million which was blocked at a time when the restraint was being applied to *all* funds payable to Pertamina and before the ownership of the account was decided. The $277 million fund exists because that amount of money is "sufficient ... to satisfy the judgment," in the words of the June 18, 2002 Court of Appeals order.

It is necessary now to return to the matter of restraint of Retention Fees in the adjudicated accounts. For reasons explained earlier in this opinion, we do not look to the $277 million to determine how much Retention Fees were subject to restraint. By virtue of the operation of the restraining notice and § 5222(b), all Reten-

tion Fees entering the adjudicated accounts from February 22, 2002 to the present have been subject to restraint, up to the amount of the judgment plus interest (as of November 2003 $290 million). The amount of Retention Fees subject to the restraint was $178 million as of December 31, 2002 and may have increased by about $10 million per month thereafter. Under § 5222(b) Bank of America is responsible for placing a hold on and accumulating restrained funds. But Bank of America had in place a fund, which was $277 million as of June 18, 2002 and which has grown to adjust for interest. Provided that the Retention Fees are sufficient, the time will come (or has come) when the amount of Retention Fees subject to restraint is exactly the amount in the Bank of America fund.

Instead of literally withholding Retention Fees, at least after June 18, 2002, Bank of America had the $277 million fund in place, as a substitute for the withholding duty it would otherwise have had. Fees, as they entered the adjudicated accounts, should be deemed to be withheld in the Bank of America fund. For instance, if $1 million in Retention Fees entered the adjudicated accounts on July 1, 2002, Bank of America did not literally need to withhold those funds, but $1 million of the funds *already* held should be considered as becoming Retention Fees withheld by Bank of America. Thus, as of December 31, 2002 the $178 million Retention Fees subject to restraint should be considered as $178 million in Retention Fees withheld by Bank of America as part of the $277 million (plus interest) fund. The same would apply to further Retention Fees up to the limit established by the Court of Appeals. The amount of these further Retention Fees is yet to be determined.

For these reasons, the court holds that KBC is entitled to restrain, and execute

on, the amount of all Restraining Fees passing into the adjudicated accounts beginning February 22, 2002 up to the amount of the judgment plus interest.

### Further Proceedings

The December 17, 2003 order of the Court of Appeals noted that the District Court should "act without delay" and should move "forward expeditiously" to determine the amount of restrained funds owned by Pertamina versus the amount owned by the Republic.

The record shows the various proceedings in the District Court designed to resolve the above issue, going back well before the December 17 order. The District Court will continue in that direction, fully mindful of the admonition of the Court of Appeals. Unfortunately, the matter is unusually complex, and issues of fact and law keep surfacing which require further proceedings to resolve.

### Conclusion

KBC's February 2003 motion is denied as moot, because the issues raised have been presented in one or more of the other motions. Pertamina's February 2003 motion to stay execution is denied. The Republic's April 2003 motion seeking release of $262 million is denied. KBC's June 2003 motion is largely granted by virtue of the decision in this opinion.

Because of the uncertainty surrounding the calculation of Retention Fees after January 1, 2003, the court is deferring any ruling about actual turnover of funds. Although the court has concluded that KBC will be entitled to execute on at least the $178 million Retention Fees for 2002, more than $100 million is in dispute pending the resolution of questions regarding 2003 Retention Fee earnings by Pertamina. Because there appears to be a substantial probability that Retention Fee earnings since January 1, 2003 will, together with

the $178 million, be equal to all, or nearly all, of the amount of the judgment plus interest, the court cannot at this time release any restrained funds to the Republic.

SO ORDERED.